STATE OF IOWA ex rel. H. M. HAVNER, Appellee, v. DES MOINES UNION STOCK YARDS COMPANY, Appellant.

J. A. PRIESTLY, Appellee, v. DES MOINES UNION STOCK YARDS COMPANY et al., Appellants.

CONTRACTS:  Construction—Commission Payable Weekly—Failure to Earn Any Commission.  An engineer who contracts to prepare the plans and specifications for, and to supervise the construction of, contemplated buildings, and as compensation therefor contracts for a percentage *commission* on the total cost of the work, payable in weekly payments of $100, which weekly payments were to be charged against said *commissions*, is not entitled to recover the weekly payments unless plans and specifications are drawn or unless buildings are erected. In other words, no weekly payment accrues unless a *commission* accrues.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

MAY 13, 1924.

THIS action was brought by J. A. Priestly against the receiver of the Des Moines Union Stock Yards Company, to recover for services claimed to have been rendered by him as an architect and engineer for said Stock Yards Company, and to establish and foreclose a mechanics' lien. The action is based on a contract entered into between Priestly and the Stock Yards Company. The trial court found, upon the issues, in favor of Priestly. The judgment and decree allowed the claim of Priestly in the sum of $4,200, with interest thereon, and established a mechanics' lien against the funds in the hands of the receiver arising from the sale of the real estate of the Des Moines Union Stock Yards Company. From the judgment and decree, the receiver appeals.—*Reversed and remanded.*

*Stipp, Perry, Bannister & Starzinger,* for appellants.

*Nourse & Nourse,* for appellee.

ARTHUR, C. J.—I. Priestly came to Des Moines and entered an office furnished him by the Stock Yards Company in West Des Moines, adjacent to the office of the Associated Packing Company, about the 1st of May, 1919. He says he began service under his contract about the middle of May. He went to work for the Associated Packing Company, a company allied with the Stock Yards Company, at the same time. Priestly says:

"Most of my time was spent for the Associated Packing Company. The Packing Company actually put in some foundations, and started the erection, and I completed drawings for the floor and foundation. I went down to the yards (Des Moines Union Stock Yards) every day or two, but I was not down there acting as a superintendent of construction."

Priestly claims that he began work under his contract about the middle of May, 1919, and continued, as he claims, until some time in April, 1920, a period of some 42 weeks. Nothing was paid to Priestly by the Stock Yards Company or the receiver for services. On the 12th day of April, 1920, Priestly filed a mechanics' lien against the premises of the Stock Yards Company, in the sum of $4,200, with interest. After filing of the mechanics' lien, the real property upon which the lien was filed

was sold, under order of court, by the receiver, and Priestly and the receiver entered into a written agreement that the lien, if any, should attach to the funds arising from the sale in the hands of the receiver.

The proposed buildings of which Priestly was to be the architect and engineer and supervisor of construction, etc., were never erected. Nothing was done at the site of the proposed yards, except some general cleaning up of the yards and repair of old structures standing on the yards at the time of purchase by the Stock Yards Company, and the erection of a small building, about 6 by 10 feet, to house a fire extinguisher. Nothing was done that required any plans or specifications. Priestly did not make any permanent plans or specifications for any buildings. He made a sketch and a list of materials for a temporary office building; but no specifications were required for it, and he made none; and the building was never erected. He made some tentative drawings or sketches, but never perfected any plans and specifications for the erection of any structure on the ground. Priestly says:

"The Stock Yards Company never were able to tell me with any degree of definiteness how large a stockyards plant they wanted or could pay for. Until I knew just exactly what they could build, and what they wanted, I could not have drawn any permanent plans. All I could do was to prepare tentative sketches of what might be done in the event money was raised by the company for building purposes."

No plans or specifications were ever perfected for any building.

Priestly says that the officers of the Stock Yards Company told him that they expected to spend about $750,000 in the erection of the stockyards and buildings in connection therewith; and that he made preliminary drawings of some proposed buildings and other improvements. The preliminary drawings must have been of imaginary improvements, because, as Priestly testified:

"The Stock Yards Company never were able to tell me with any degree of definiteness how large a stockyards plant they wanted or could pay for."

As it turned out, the Stock Yards Company never intended

to expend any of the money raised from sale of stock of the company in building a plant, and never did use any of the funds for that purpose, except to buy some land and an old stockyards, clean up the premises some, repair some hogpens and horse stalls already on the premises, and build a little shanty, for housing a fire extinguisher. Priestly was, under his contract, to receive for his services a commission of 7½ per cent on the proposed expenditure of $750,000, which would amount to about $56,000. In fact, the Des Moines Union Stock Yards Company and the Associated Packing Company were part and parcel of the same scheme, conceived and controlled by the same people, and operated for the same general purposes. The whole scheme was conceived and executed in fraud, and the charters of both corporations were annulled, upon action brought by the attorney-general in the name of the State, and their affairs were placed in the hands of a receiver. The Stock Yards Company, it may be said from the record, never intended to erect buildings upon the ground purchased. It can scarcely be doubted that Priestly had full knowledge of the fraudulent scheme from the beginning. In the case of *Priestly v. Associated Packing Company*, 195 Iowa 1318, where a contract identical with the one here under consideration was involved, discussing the relation of Priestly in the transaction we said:

"The court below found in this proceeding that appellant was fully conversant with the whole scheme, 'of which he was a beneficiary,' and with its 'manifold implications.' This finding is not based upon any direct evidence in the record. It must be confessed, however, that it requires some credulity for the court to believe that the close and intimate association of Priestly with Frisby and other promoters of the enterprise for ten months did not result in more or less complete information on his part as to its fraudulent character, if he was not otherwise familiar therewith."

In the Associated Packing Company case, Priestly sought to recover for his services, under the contract, "a commission equal to 7½ per cent of the total cost of the work." The cost of the work in that case was about $200,000. His claim in that case was for about $10,000, based on about $200,000 worth of work done and materials furnished, upon which 7½ per cent amounted

to about $15,000. Priestly had been paid by the Stock Yards Company $4,700 in weekly payments made to him by the company, and claimed for the balance, of $10,000.

II. By the terms of the contract, Priestly became the architect and engineer to supervise and construct to completion the stockyards plant which the Stock Yards Company proposed to erect in the city of Des Moines. Priestly was to prepare the plans and specifications in all details for the erection of the plant, and to supervise the purchase of materials and equipment, hire all labor, and supervise the construction of all buildings of the plant, etc. As before mentioned, in the *Packing Company* case Priestly sued to recover a commission of 7½ per cent on improvements made, costing about $200,000. In the instant case, his contract is identical with his contract in the *Packing Company* case, but he does not seek to recover under the provision for commission. His suit is to recover for weekly installments provided for in the contract. Involved in the case is the construction of the contract, as applied to the services rendered by Priestly. Priestly testified:

"I am claiming compensation from the Stock Yards Company at $100 a week from May 19th to along in April, 1920, which includes about three weeks after the temporary receiver was appointed. I am claiming until I was notified that my services would not be needed. After the receiver was appointed, I do not recall that I did anything for the Stock Yards Company."

III. The portion of the contract relating to amounts to be paid Priestly is as follows:

"The first party agrees to pay and the second party agrees to accept as full compensation for second party's services as stated herein a commission equal to 7½ per cent upon the total cost of the work. To be paid in installments as follows: As soon as the preliminary work is started a sum of $100 shall be paid each and every week thereafter until the completion and acceptance of all the work. This weekly payment of $100 shall be charged to the second party against commissions earned or to become due under this contract. Additional payments are to be made from time to time as the work progresses, to wit: There shall be paid on or about the first day of each month 75 per cent of all earned commissions based on cost of all material

and equipment on the ground and all labor performed. In no event shall the said weekly and monthly payments exceed 75 per cent of the estimated earned commissions and when the work is finally completed there shall be due and paid to the second party the balance of the commissions earned, as provided in this contract."

The above provision is clear, and requires no effort of construction. In the *Packing Company* case, in speaking of this provision, we said:

"The contract provided for compensation in the form of a commission equal to 7½ per cent of the total cost of the work, the same to include the cost of all material, labor, appliances, and equipment necessary for the construction and equipment of a completed packing plant, the same to be paid, $100 per week, and 75 per cent of all earned commissions, based on cost of material and equipment on the ground and all labor performed monthly."

Defining the phrase "total cost of work," the contract reads:

"It is also agreed, that wherein in this contract the term 'total cost of the work' has been used, it is to be interpreted as the total cost of all material, labor, appliances, and equipment, of whatsoever nature necessary for the execution of the work and required in the construction and equipment and to produce and provide a fully equipped complete finished stockyards and other buildings and kindred industries connected therewith, all delivered up in a complete and finished condition ready to operate. The cost of the real estate comprising the site or sites shall not be included in the term 'total cost of the work.'"

It seems clear from the first above quoted portion of the contract, referring to the compensation that was to be paid Priestly in the event the plant was constructed, Priestly was to receive 7½ per cent of the cost of construction. Cost of construction was the basis upon which he was to be paid, if the plant was constructed. Payment was to be made to him in weekly installments of $100. Obviously, the weekly installments were not intended to be a basis of compensation, but were a method of making payment of the commission that should become due to Priestly; and until a commission accrued which

was the basis of his compensation, Priestly was not entitled to the installments of $100 a week. In other words, Priestly was not entitled to the installments unless he was entitled to his commission provided for in the contract, of 7½ per cent upon some amount. Another provision of the contract relating to weekly installments, reads:

"As soon as the preliminary work is started, a sum of one hundred dollars shall be paid each and every week thereafter until the completion and acceptance of all the work. This weekly payment of one hundred dollars shall be charged to second party against commissions earned or to become due under this contract. It is further agreed that in event first party fails to finance said packing plant and work herein contemplated and is unable to build the same, then * * * party of the first part shall pay the second party for services rendered in preparing said plans and specifications and supervising of any construction work, a sum equal to all advances and payments made to second party during the time said second party is engaged in making said plans and specifications and supervising any construction work."

The contingency referred to in the above provision arose. The Stock Yards Company did not finance the proposed plant, and it was never built. The Stock Yards Company never proceeded beyond the promotion stage. In the *Packing Company* case, speaking of this paragraph of the contract, we said:

"This paragraph of the contract was evidently executed for the protection of the packing company, and must be construed as a limitation upon the commissions which Priestly could claim under the contract if the project failed to be carried out because of inability on the part of those in charge to finance it, which commissions could not exceed 75 per cent of 7½ per cent of the total cost of labor and material used upon the premises, the $100 weekly payments to be deducted therefrom."

In the *Packing Company* case, Priestly was paid weekly installments, which he applied on his commission. He was denied recovery upon the balance of the commission, but was allowed, in addition to the amount he had received by weekly installments, an additional amount, which the court found would

compensate him for the fair and reasonable value of his services. Adverting to such allowance, we said:

"This allowance was not based upon any affirmative evidence in the case; but, as the Associated Packing Company has not appealed, it must stand."

In the *Packing Company* case, as we understand the record, Priestly credited the amount of his commission with the weekly installments he had received, and such allowance was not contested.

We reach the conclusion that compensation under the contract must be based upon the commission provided for, and not otherwise. The instant action is not predicated upon the commission provisions of the contract. The suit is for recovery of installments which Priestly claims he was and is entitled to, which were never paid him. A very small commission, if any, was earned. Priestly devoted some time and did some work in the way of making some tentative plans and sketches of proposed buildings, and some money was spent on repair work at the stockyards while Priestly was connected with the company. The grounds were cleaned up, and a little building 6 by 10 feet was constructed, and some lumber was bought for construction of an office building, which was never built during the time Priestly was connected with the company. But the record does not disclose any facts upon which to fix compensation for any services he may have performed in those particulars, either on a percentage basis or *quantum meruit*. Perhaps—we do not pass upon it—Priestly may be entitled to reasonable compensation for the work he actually performed.

The estate being still in the hands of a receiver, the case is reversed and remanded, for further proceedings desired, not inconsistent with our holding herein.—*Reversed and remanded*.

EVANS, PRESTON, and FAVILLE, JJ., concur.